**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

APRIL D. SHEFFIELD,

      Plaintiff,

v.                                                                    Case No: 8:15-cv-319-T-30TBM

CITY OF SARASOTA, JASON REED,
JOHN LAKE and TODD TSHETTER,

      Defendants.

_____

## ORDER

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment (Dkt. 27) and Plaintiff's Responses (Dkts. 32 and 33). The Court has reviewed the pleadings, the evidence, and the relevant law and concludes that the facts, viewed in the light most favorable to Plaintiff, do not support her claims for false arrest and unreasonable search and seizure. For this reason, on which the Court will elaborate below, summary judgment will be granted.

## BACKGROUND

Plaintiff Sheffield alleges that three police officers from the City of Sarasota, Florida, wrongfully arrested her and used excessive force in doing so. The case was originally filed in state court in 2012, when Sheffield was represented by counsel. After three-and-a-half years and a long procedural history, *see* Dkt. 8, p. 3, Sheffield now proceeds *pro se*. Though the material facts occurred in 2008, they are largely undisputed.

*Undisputed Facts*

Sheffield operates a business as a landlord in Sarasota, Florida. More accurately, Sheffield's business is that of a sub-landlord: she rents residential properties and then subleases those properties to other tenants at a markup. (Sheffield Interview, Dkt. 27-3, pp. 3, 5). In 2008, one of those properties was a Sarasota apartment that Sheffield rented from Linda Holland, as agent for the property owner, and subleased to mother and daughter Shanna and Michelle Rogers. (Lease Agreement, Dkt. 27-1, p. 1; Sublease Agreement, Dkt. 27-2, p.1). The Rogers' sublease ran from June 18, 2008 to December 18, 2008, and it conveyed the right to quiet enjoyment in the premises. (Dkt. 27-2, pp. 1-2).

On September 2, 2008, Michelle Rogers called 911 to request assistance in a landlord/tenant dispute she was having with Sheffield. Rogers claimed that she was being wrongfully evicted. Sheffield took a different position: she claimed that she was simply moving some property she owned out of the apartment (she subleased the apartment furnished) and holding Rogers to a previous verbal agreement that Rogers would vacate the premises by that date. Sheffield further claimed that her lease agreement with Holland was being terminated and that, accordingly, Rogers would have to vacate by virtue of this fact as well. (Dkt. 27-3, p. 8). Sheffield never served a formal eviction notice on Rogers or the property. (Id.; Schetter Aff., Dkt. 28-1, p. 2).

City of Sarasota police officers Reed, Lake, and Tschetter responded to the 911 call. (Dkt. 27-3, p. 4; Dkt. 28-1, p. 2). When the officers arrived at the apartment, Sheffield was removing items from the property. (Dkt. 27-3, p. 4). Rogers was protesting. (Id.; Dkt. 28-1, p. 2). To investigate the dispute, officers sought proof of lawful residence from Rogers.

2

(Dkt. 27-3, p. 5). Rogers first provided a copy of a utilities bill with her name on it, but the officers were not satisfied with this form of proof. Rogers then provided a copy of her sublease, which corroborated her claims that she had a right to occupy the apartment. Next, the officers called Holland, the property manager, who confirmed that the property was leased to Sheffield and that Sheffield had subleased the apartment to a third party. (Dkt. 27-3, pp. 4-5; Dkt. 28-1, p. 2). Holland also stated that she was not in the process of evicting Sheffield.

Finally, the officers called the Sarasota County Sherriff's office and learned that the property did not have any eviction notices on file. (Dkt. 28-1, p. 2). Based on this information, the officers concluded that Rogers, per the terms of her sublease, still enjoyed the right to quiet enjoyment of the apartment and that Sheffield's continued presence there, over Rogers's objection, amounted to trespassing. So the officers asked Sheffield to leave.

As Sheffield later told a police internal affairs investigator, she responded by saying, "[Y]ou know what, in order for me to go you're just gonna have to arrest me." (Dkt. 27-3, p. 9). The officers obliged, arresting Sheffield for trespassing in violation of Florida Statute Section 810.09.

The officers cuffed Sheffield behind her back and escorted her to a patrol car. Sheffield objected to being cuffed behind her back, to being cuffed too tightly, and to having her arm pulled on. (Dkt. 27-3, p. 9). Frustrated, Sheffield physically resisted with an act that she described as coming to a "screeching halt" and "put[ting] my weight down to stop [and] jolt him to tell him to stop pulling on me like that." When she did this, she fell momentarily to the ground, on her back side. (Id. at 9-10).

*Disputed Facts*

Sheffield claims that the fall caused her injuries, though she does not specify the type or degree of injury. She also claims that throughout her interaction with the officers, the officers used harassing and, at times, racist language. In a police interview, Sheffield stated that officers referred to her as a "slumlord" and a "piece of damn work," that Officer Reed threatened to use his mace on her, and that Officer Lake bragged while arresting her, saying "we got the power today." (Id.). In her response to the motion for summary judgment, Sheffield claims that the officers referred to "White Power," called her a "Newtown Nigger," and told her that she "need[s] to get back on that boat and go back to Africa." (Dkt. 32).

In a sworn affidavit, Officer Tschetter denied that he ever used a racial epithet toward Sheffield and denies ever hearing any of the other officers using such language during their entire encounter with Sheffield.

## DISCUSSION

After several motions to dismiss and amended complaints, Sheffield's complaint now comprises seven counts: three counts, one against each of the three officers, for unreasonable search and seizure in violation of 42 U.S.C. § 1983; and four counts, against the City and each of the three officers, for false arrest under state law. Under 42 U.S.C. § 1983, however, a false arrest is an unreasonable search and seizure that can form the basis of a federal 1983 claim. *See Case v. Eslinger*, 55 F.3d 1317, 1326 (11th Cir. 2009). So is the use of excessive force in conducting the arrest. *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). Conceptually, then, Sheffield's complaint divides more neatly into two

different categories of claims: federal and state law claims for false arrest; and federal claims for use of excessive force during the arrest. After first detailing the summary judgment standard, the Court will address Sheffield's claims with this conceptual approach.

## Summary Judgment Standard

A motion for summary judgment forces a court to "pierce the pleadings and [] assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Motions for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue over any material fact and that the moving party is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; rather, the record must reveal a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). Facts are material if, under the applicable substantive law, they might affect the outcome of the case. *See id*. And disputes over those facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To carry this burden, the moving party can present evidence to this effect or instead show that the non-moving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.* at 322-23.

If the moving party meets its burden, non-moving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324. Conclusory allegations will not suffice. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Neither will "a mere scintilla of evidence supporting" the non-movant's claims. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted). The non-movant must instead present facts that are significantly probative to support those claims. *Anderson*, 477 U.S. at 248-49 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968) (requiring that "sufficient evidence supporting the claimed factual dispute be shown to [defeat the motion and] require a jury or judge to resolve the parties' differing versions of the truth")).

A court ruling on a motion for summary judgment must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson,* 477 U.S. at 255. After the non-moving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

***Federal and State Claims for False Arrest***

Both federal and Florida law authorize claims against police officers, and their governing municipalities, for false arrest. *See* 42 U.S.C. § 1983 and *Case v. Eslinger*, 55 F.3d 1317, 1326 (11th Cir. 2009); *see also Willingham v. City of Orlando*, 929 So.2d 43, 48 (Fla. 5th DCA 2006). The precise contours of the claims vary slightly: under federal law a false arrest is "a warrantless arrest without probable cause," *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004), while in Florida a false arrest is "the unlawful restraint of a person against that person's will." *Willingham*, 929 So.2d at 48. But in both jurisdictions, the presence of probable cause defeats the claim and entitles the defendants to summary judgment. *See Kingsland*, 382 F.3d at 1226; *Mailly v. Jenne*, 867 So.2d 1250, 1251 (Fla. 4th DCA 2004).

Probable cause to arrest exists "when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992).[1]

Here, probable cause—under the federal and Florida standard—existed to arrest Sheffield, and her claims for false arrest must therefore fail. Sheffield was arrested for

---

[1] The standard in Florida is only slightly, and not substantively, different: "when the circumstances are sufficient to cause a reasonably cautious person to believe that the person accused is guilty of the offense charged." *Miami-Dade County v. Asad*, 78 So.3d 660, 670 (Fla. 3d DCA 2012) (citing *Mailly v. Jenne*, 867 So.2d 1250, 1251 (Fla. 4th DCA 2004)). In the context of a false arrest claim, Florida law does treat probable cause differently in one significant respect. Florida considers it an affirmative defense, which means the defendant bears the burden of persuasion. *Mailly*, 867 So.2d at 1251. Here, however, this is a distinction without a difference because the facts clearly show that, wherever the burden lies, it has been overcome.

violating Florida's law against trespassing, which states: "[a] person who, without being authorized, licensed, or invited, willfully enters upon or remains in any property . . . [a]s to which notice against entering or remaining is given, either by actual communication to the offender or [other methods of notice], commits the offense of trespass." Section 810.09, Florida Statutes. Among the facts known to the officers allowing them to reasonably conclude that Sheffield was trespassing on the subleased property were the following:

- that Rogers' sublease conveyed to her the right of quiet enjoyment (Dkt. 27-2, pp. 1-2 ("Sublessor . . . shall not do anything to disturb Subtenant's use of the Subleased Premises."));
- that Rogers objected to Sheffield's presence on the property;
- that Holland, the property manager, stated that she was not evicting Sheffield or otherwise demanding that anyone vacate the premises; and
- that Sheffield had not initiated formal eviction proceedings against Rogers by serving her or the property with a formal eviction notice.

And yet, the officers first sought a more delicate course of action by asking Sheffield to leave the premises. Even before she refused their request, and certainly after, the officers had sufficient information to reasonably conclude that Sheffield had committed and was committing the crime of trespass. *See Gonzalez*, 969 F.2d at 1002. Their arrest was supported by probable cause. Sheffield's federal and state law claims for false arrest must therefore fail. *See Kingsland*, 382 F.3d at 1226; *Mailly*, 867 So.2d at 1251. Summary judgment as to them will be granted.

### *Federal Claims for Use of Excessive Force*

Even a lawful arrest, however, may form the basis of a federal 1983 action if the arrest is made with the use of excessive force. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th

Cir. 2002). When evaluating such claims against officers, courts must apply the rubric of qualified immunity.

Qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Qualified immunity is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee*, 284 F.3d at 1194 (internal quotation marks and citations omitted).

Courts use a two-part framework to evaluate the propriety of qualified immunity. The first part asks whether the allegations, if true, establish a constitutional violation. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (internal citations omitted). If the facts, viewed in the light most favorable to the plaintiff, do establish a constitutional violation, the next inquiry is whether the right violated was "clearly established." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). A court must be able to answer both questions affirmatively for an official to lose qualified immunity, and a court may conduct its analysis in whatever way is most suitable to the case. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009)).

Here, the Court will only evaluate Sheffield's allegations and whether they establish a constitutional violation because, for the reasons that follow, the Court concludes that they do not.

An excessive force claim is, at its core, a question of reasonableness, which requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (internal quotation marks and citations omitted). According to the Supreme Court, district courts should look to several factors, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989)). Meanwhile, courts should also consider that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. To this end, a law enforcement officer receives qualified immunity for his use of force during an arrest so long as a reasonable officer in the same situation could have believed that the use of force was not excessive. *Vinyard*, 311 F.3d at 1347.

Accepting all of Sheffield's allegations as true, the Sarasota police officers only used force against her after she told the officers that, if they wanted her to leave the premises, they would have to arrest her. They did, and Sheffield first contends that their

10

use of force was excessive because they cuffed her tightly behind her back and physically moved her by holding her arms and walking her away from the premises.

As an initial point, after being told by a trespassing suspect for which there is probable cause to arrest, as there was here, "in order for me to go you're just gonna have to arrest me," a police officer is certainly reasonable to conclude that arresting and physically removing the suspect, given the guidance just provided by the suspect, is not an excessive, but an invited and necessary, use of force. *Compare Stephens v. Broward Sheriff's Office*, 84 F. Supp. 3d 1327, 1340 (S.D. Fla. 2014) ("Standing after the [officer] pushed him down into his seat, for example, could be interpreted as a prelude to resistance.") This logic aside, the law in this Circuit does not support Sheffield's claims. *See Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (holding that allegations of placing cuffs tightly behind the back, which caused skin abrasions, did not rise to the use of force required to overcome qualified immunity).

Sheffield next claims that the officers used excessive force in the way they moved her toward a patrol car. But Sheffield's own admissions belie this claim. Sheffield stated in an interview with police investigators that she came to a "screeching halt" before falling on her backside. She further described her screeching halt as an attempt to "put my weight down to stop [and] jolt [the officers]." Sheffield, in other words, resisted arrest, and the force she suffered when she fell to the ground, according to her own statements, was as likely the result of her resistance as it was any police force. After this fall, Sheffield claims that she was dragged to the patrol car. Although the officers dispute this claim, accepted as true, the government has a legitimate interest in completing an arrest that it has undertaken

11

to make. To physically move a resisting, non-compliant arrestee is hardly excessive in light of this countervailing government interest. *See generally Vinyard*, 311 F.3d at 1348; *see also id.*, at 1348 n. 12 (citing cases from other circuits concluding that the use of "pepper" spray was not excessive when suspects were resisting arrest).

Applying the three factors identified by the Supreme Court, the Court recognizes that Sheffield's crime, trespass, is a minor offense. It also appears from the record that the officers did not perceive Sheffield to be a threat to them or any bystanders. Sheffield did, however, resist arrest, and no reasonable officer would conclude that the force used in response was excessive in light of the officers' responsibility to complete the arrest. The force the City of Sarasota police officers used in arresting Sheffield was not excessive. *See Vinyard*, 311 F.3d at 1347.

Sheffield's allegations that the officers used intimidating and racist language are troubling. And the Court must consider them. *See Brown v. City of Hialeah*, 30 F.3d 1433, 1436 (11th Cir. 1994) (concluding that when evaluating excessive use of force claims, facts surrounding the arrest "include the full atmosphere at the time," to include the use of racist language).[2] But ultimately, the question is one of objective reasonableness, which "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at

---

[2] The court also takes account of the fact that Sheffield's allegations of racist remarks appear only in pleadings and not in any evidence submitted to the Court. *See Celotex*, 477 U.S. at 324; *see also Avirgan*, 932 F.2d at 1577.

396-97. Here, the force used against Sheffield was a reasonable amount necessary to overcome her admitted resistance to arrest. Sheffield's constitutional right against unreasonable seizures was not violated. Qualified immunity on her 1983 claims will be granted.

It is ORDERED AND ADJUDGED that:

1.      Defendants' Motion for Summary Judgment (Dkt. 27) is GRANTED.

2.      The Clerk is directed to enter judgment on all counts in favor of Defendants.

3.      The Clerk is further directed to close this case and terminate all pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this 24th day of February, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record